**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FORT SMITH DIVISION**

| | | |
|---|---|---|
| KIMBERLY RULOPH | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-02053-PKH |
| | ) | |
| LAMMICO d/b/a LAMMICO | ) | |
| RISK RETENSION GROUP, INC.; | ) | |
| WASHINGTON REGIONAL MEDICAL | ) | |
| CENTER; MERCY HOSPITAL - | ) | |
| FORT SMITH; JODY A. BRADSHAW, | ) | |
| M.D.; KRISTIN PECE, M.D.; MERCY | ) | |
| CLINIC FORT SMITH COMMUNITIES; | ) | |
| ROBERT A. IRWIN, M.D.; and | ) | |
| JOHN DOES 1-10 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Comes now Kimberly Ruloph (Kimberly), Plaintiff herein, and for her claims against LAMMICO d/b/a LAMMICO Risk Retention Group, Inc. (LAMMICO), Washington Regional Medical Center (WRMC), Mercy Hospital – Fort Smith (Mercy), Jody A. Bradshaw, M.D. (Bradshaw), Kristin Pece, M.D. (Pece); Mercy Clinic Fort Smith Communities (Clinics), Robert A. Irwin, M.D. (Irwin); and John Does 1-10, states:

1.     Kimberly is, and was at all times relevant herein, a resident and Citizen of Logan County, Arkansas.

2.     LAMMICO is a foreign insurance company which is qualified to, and is doing, business within the state of Arkansas, and has an agent for service of process within Arkansas.  LAMMICO is therefore subject to the personal jurisdiction of this Court.

3.     WRMC, Mercy and Clinics are each corporations incorporated under the laws of the state of Arkansas, have their principal place of business in Arkansas, and therefore are subject to the personal jurisdiction of the Court.

4.     Bradshaw is, and was at all times relevant herein, a resident of the state of Arkansas, and therefore subject to the personal jurisdiction of the Court.

5.     Irwin is, and was at all times relevant herein, a resident of the state of Arkansas, and therefore subject to the personal jurisdiction of the Court.

6.     Pece is, and was at all times relevant herein, a resident of the state of Arkansas, and therefore subject to the personal jurisdiction of the Court.

7.    John Doe 1 was, at the time of the occurrence described herein, the employer of Irwin, the identity of which is unknown to Plaintiff. At all times, Irwin was acting within the scope of his employment by John Doe 1, and therefore, John Doe 1 and Irwin are jointly and severally liable for all damages caused by any fault on the part of Irwin.

8.    John Does 2-10, were, at the time of the occurrence described herein, liability insurers of WRMC, Mercy and Clinic, or one or more of them, whose identities are unknown to Plaintiff.

9.    The claims asserted herein in Count I of this Complaint arise under of the Emergency Medical Treatment and Labor Act  (EMTALA) 42 U.S.C. § 1395dd.  This Count, therefore, presents a question of federal law, as to which subject matter jurisdiction is conferred by 28 U.S.C. § 1331.

10.    The state law claims set forth in Count II through Count VIII of Kimberly's Complaint, describe acts and omissions of all Defendants, which constitute an interrelated course of conduct which was the proximate cause of the occurrence heretofore described and consequent injury to and related damages suffered by Kimberly.  The federal question alleged in Count I arises out of this course of conduct of Defendants.  The course of conduct which forms the basis of state law claims is so intertwined with

3

acts of omissions upon which the federal claim under 29 U.S.C. § 1395dd

is based as to constitute the same case or controversy.  Subject matter

jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a).

11.    Kimberly is a resident of Paris, Arkansas, and is presently forty-

six (46) years of age, and has a remaining lifetime of 33.71 years under the

statutory mortality table, which appears as Ark. Code Ann.§ 18-2-105.

12.    LAMMICO is and was, at all times relevant herein, the liability

insurer of WRMC under a policy of liability insurance identified as policy no.

3-H5000008 (LAMMICO Policy).

13.    WRMC is a not for profit Arkansas corporation, with its principal

place of business in Fayetteville, Arkansas.  WRMC owns and operates the

hospital which provides general hospital services to the public, including

emergency medical services.  WRMC is a charity, and therefore, not

subject to suit in tort.

14.    Mercy owns and operates a hospital in Fort Smith, Sebastian

County, Arkansas.  Mercy provides general hospital and medical services

to the public, including emergency medical services.  Mercy has entered an

agreement with the Secretary of Health and Human Services, under 42

U.S.C. § 1395cc.  Mercy is a participating hospital, and is therefore subject

4

to EMTALA, 42 U.S.C. § 1395 dd.

15.    Clinics is an Arkansas corporation engaged in the business of providing medical and healthcare services in the Fort Smith, Arkansas area, through physicians and other healthcare providers and professionals employed by it.

16.    Bradshaw is, and was at all times relevant herein, a medical doctor duly licensed in the state of Arkansas, who practices a specialty of orthopedic surgery at Mercy hospital.  Bradshaw is an employee of Clinics, and at all times mentioned herein, was acting within the scope of his employment by Clinics.  Clinics is, pursuant to *the doctrine of respondeat superior*, vicariously liable for any negligence, fault, or deviation from the standard of care by Bradshaw.

17.    Pece is, and was at all times relevant herein, a medical doctor duly licensed in the state of Arkansas, and who practices a specialty of emergency medicine at Mercy hospital.  Pece is an employee of Clinics, and at all times mentioned herein, was acting within the scope of her employment by Clinics.  Clinics is, pursuant to *the doctrine of respondeat superior*, vicariously liable for any negligence, fault, or deviation from the standard of care by Pece.

18.    Irwin is and was at all times relevant herein a medical doctor duly licensed by the state of Arkansas, practices the medical specialty of emergency medicine.  At all times relevant herein, Irwin was an employee of WRMC and John Doe 1.  All acts and omissions alleged herein by Irwin were done within the scope of his employment, and therefore, Irwin and John Doe 1 are jointly and severally liable for any damages proximately caused by fault of Irwin.

19.    John Does 2-10 are insurance companies which, at all times relevant herein, provided liability, or excess liability or coinsurance to WRMC, Mercy, and Clinics, and John Doe 1, or one or more of them.  In compliance with Ark. Code § 16-56-125, an Affidavit of Plaintiff's attorney is attached hereto, marked Exhibit "A" and incorporated herein by reference thereto.

20.    All references herein to "April" are intended to mean "April 15, 2018."  All references to time are intended to mean a specific time on April 15, 2018.

21.    On the 15th day of April, 2018, at approximately 10:50 A.M., Plaintiff was walking to her church from the church parking lot, when she stumbled or tripped over a curb, or some other raised structure, which

6

caused her to fall to the sidewalk or walking area.  As a consequence of her fall, she sustained dislocation of her left knee.  Emergency Medical Services for Logan County was notified, and promptly responded to the notice. Logan County EMS personnel arrived at the scene of Kimberly's injury at approximately 11:00 A.M. on April 15.  While preparing Kimberly for ambulance transport to the Emergency Department at Mercy, Logan County EMT's documented at 11:10 A.M., that she had lost a palpable dorsal and posterior pedal pulse.  At that point, Kimberly entered a critical six-hour window during which it was probably that restoration of blood flow in her lower left leg would avoid the necessity of amputation.

22.    Kimberly arrived at Mercy's emergency department at 12:09 P.M., and was admitted by Pece at 12:12 P.M.  Upon arrival at Mercy Emergency Department, Pece was provided Kimberly's history by a Logan County EMS EMT, including the fact that she had no pulses to the leg since before 11:10 A.M.  At 12:19 P.M., Pece called a level 2 trauma, and the trauma team was activated.  Pece requested a consult with Bradshaw, who was the orthopedic surgeon on call.

23.    Bradshaw arrived at Kimberly's bedside, and promptly reduced the dislocation of Kimberly's left knee by manipulation.  The reduction of

7

the dislocation was accomplished at 12:55 P.M.  Bradshaw ordered STAT

Doppler studies, which demonstrated that Kimberly was without detectible

blood flow to the lower left leg, which was noted by Bradshaw at 1:05 p.m.

At that point, Bradshaw and Pece knew, or reasonably should have known,

that only four hours remained of the window for restoring blood flow to the

left lower leg in order to save it from amputation.  Bradshaw and Pece

knew, or reasonably should have known that to restore blood flow to the left

lower leg would require the services of a vascular surgeon, which services

were not, at that time, available at Mercy.  Instructions were given to

commence arrangements for transfer of Kimberly to a facility where the

services of a vascular surgeon where available.

    24.   At 1:12 P.M., personnel from Mercy contacted the Arkansas

Trauma Call System (Call Center) for directions as to facilities where

medical services and personnel were available to treat Kimberly's

emergency condition.  The Arkansas Trauma Call System (Trauma

System) is an arm of the Arkansas Department of Health (ADH), of which

Mercy is a member.  The Call Center is a facility operated by the Trauma

System which ostensibly has current information as to medical services

and specialties currently available at member hospitals.  Under an

agreement with ADH, the members of the Trauma System agree to utilize the Call Center for the purpose of determining an appropriate facility for patient transfers, and for effecting the transfer. The member hospitals agree to provide and maintain their respective information and the Call Center on a current basis.

25.     Upon receipt of a call from Mercy, the Call Center was informed of the nature of Kimberly's emergency, and that services of a vascular surgeon were needed in order to treat Kimberly's peripheral condition. The Call Center system reflected WRMC, also a member of the Trauma System, had available on a 24-hour basis, the services of a peripheral vascular surgeon. This information was false and incorrect due to WRMC's failure to provide, or maintain its information provided to the Call Center with current and accurate information as to services it had available.

26.     From the information available to the Call Center it appeared that WRMC was the nearest facility with capability to treat Kimberly's condition. The Call Center, in reliance upon the accuracy of WRMC's information, contacted WRMC in order to obtain its consent to the transfer of Kimberly to it for her acutely needed surgery in order to save her leg.

27.     Irwin responded to the call on behalf of WRMC. Irwin was an

emergency department physician on duty at the time.  Ultimately, Mercy and Bradshaw became parties to the telephone call.  Bradshaw informed Irwin of the nature of Kimberly's situation, and specifically included the fact that she had a pulseless lower left leg.  Irwin, without determining whether a peripheral vascular surgeon was available, and acting for WRMC, accepted transfer of Kimberly from WRMC.  WRMC did not, notwithstanding the information it had provided the Call Center, have the services of a peripheral vascular surgeon available.  When WRMC determined that it did not have a peripheral vascular surgeon available, WRMC refused to treat Kimberly.  This was communicated to the Call Center only after Kimberly had been dispatched by ground ambulance from Mercy.  Both Pece and Bradshaw failed, before ordering Kimberly's transfer, to obtain an express determination that a vascular surgeon was currently available at WRMC.

28.    At 1:10 P.M., Bradshaw ordered a CT angiogram examination of Kimberly's left leg.  Even though he knew or reasonably should have known time was critical, it was not ordered on a STAT basis. Kimberly was not taken to a CT suite until 1:48 P.M.  The CT angiogram was completed at 2:20 P.M.  Even though her transfer to WRMC had been ordered, she

was returned to her room at 2:21 P.M. rather than to the ambulance for

transport.  She was not placed in the ambulance until 2:53 P.M.  She

departed for WRMC at 2:55 P.M., and arrived there at 3:50 P.M.  It was

known that at 11:55 A.M. that Kimberly had a blockage of blood flow to her

lower left leg, and that time for restoring the blood flow was very critical and

that she required the services of a peripheral vascular surgeon not

available at Mercy hospital.  It was however, three hours after criticality of

her situation had been diagnosed before she was transferred.

29.    At 1:37 P.M., Pece ordered Kimberly's transfer to WRMC,

which it accepted the transfer, and ordered it by ground ambulance,

knowing that it was approximately a one hour trip from Mercy to WRMC by

ground.  Pece, while Kimberly was on route to WRMC, Mercy was notified

by WRMC that it had determined that contrary to the information it provided

to the Call Center, it did not have a peripheral vascular surgeon available,

and therefore WRMC would be unable to treat the loss of blood flow to her

lower left leg.  The determination was made before she arrived to WRMC,

that she should be, upon arrival, taken by air ambulance to Mercy hospital

in Springfield, Missouri, where a peripheral vascular surgeon was available.

30.    At 4:53 p.m., Kimberly departed from WRMC by air transport.

She arrived at 5:42 p.m. at Mercy Hospital in Springfield, Missouri (Mercy Springfield).

31.    Kimberly was admitted to the emergency department at Mercy Springfield at 5:55 p.m., and was promptly examined by the emergency room physician, who requested that she be seen by Dr. Keith Allen, a peripheral vascular surgeon.  Dr. Allen examined Kimberly at 6:34 P.M., and found that she had no palpable pulses or Doppler signals in her left foot.  Her left leg, below the knee, was cold, insensate, and without reflexes.   At that point, due to the passage of time without blood flow to the lower left leg, it was dead and beyond saving.  The following morning, April 16, 2018, Dr. Allen performed surgery on Kimberly's left leg in an attempt to save it.  The left lower leg was, however, beyond being saved, and therefore, was amputated above the knee.

32.    The loss of Kimberly's lower left leg was caused by the delay in getting her to a vascular surgeon within the six hour window within which there was a reasonable probability of the leg being saved by restoring blood flow to the leg. This delay was due to the inordinate amount of time Kimberly was kept at Mercy, and the two critical hours lost because of the futile transfer to WRMC.  The misguided transfer of Kimberly to WRMC,

and the consequent loss of two critical hours, was caused by the false and misleading representation that WRMC provided to the Call Center as regards the availability of peripheral vascular services. It was also caused, by WRMC's accepting transfer of Kimberly to it when it knew, or reasonably should have known, that, contrary to information provided to the Call Center, it did not have a peripheral vascular surgeon available.

33.    At all times relevant herein, Pece and Bradshaw, in addition to being employees of Clinic, were acting as agents or employees of Mercy, and were acting within the scope of their agency or employment.

34.    At all times relevant herein, Irwin was acting as an employee of WRMC, and was acting within the scope of his agency or employment.

35.    Kimberly's loss of her leg, and all damages resulting therefrom, were proximately caused by the fault of the Defendants, as herein alleged. The fault of the Defendants consists of a violation of EMTALA, ordinary negligence and deviation from the standard of care required by medical providers.  The fault of each Defendant was contrarily concurrent with the fault of all other Defendants.

36.    As a direct and proximate result of the fault of the Defendants, Kimberly has sustained in the past, and will sustain in the future, the

following elements of damage:

      a.    Past and future pain, suffering and mental anguish;

      b.    Past and future medical, hospital, and rehabilitation expenses;

      c.    Loss of earnings in the past;

      d.    Impairment of future earning capacity;

      e.    Permanent physical impairment due to the above-the-knee amputation of her left leg;

      f.    Scars, disfigurement and visible results of her injury.

Kimberly's damages proximately caused by the fault of Defendants exceeds the minimum amount required for jurisdiction of United States District Courts in diversity of citizenship suits.

## COUNT I.

37.    Kimberly incorporates herein as a part of her claims against Mercy under Count I, the foregoing allegations of paragraphs 1 through 36.

38.    Mercy is a participating hospital as defined by 42 U.S.C. § 1395 dd(e)(2), therefore subject to requirements of EMTALA,  42 U.S.C. § 1395. Mercy has an emergency department, and under EMTALA, is obligated to

provide appropriate screening for anyone that comes to its emergency department for purposes of determining whether that person has an emergency medical condition. An "emergency medical condition" for purposes of EMTALA, means a medical condition manifest in itself by acute symptoms of sufficient severity such that, in the absence of immediate medical attention, it would reasonably be expected that the health of the person would be in serious jeopardy, would result in serious impairment of bodily function, or serious disfunction of any bodily organ or part, as provided by 42 U.S.C. § 1395 dd(e)(1)(A).

39.    When Kimberly came to Mercy's emergency department, she had an emergency medical condition, which made the loss of her leg absent timely surgical intervention imminent. The screening examination in the Mercy Emergency Department established this emergency medical condition. Pursuant to 42 U.S.C. § 1395dd(b), Mercy was required either to appropriately treat the medical condition, or to make an appropriate transfer to a medical facility in accordance with 42 U.S.C. § 1395dd(c). An "appropriate transfer" as defined by EMTALA, is a transfer to a receiving facility, which has qualified personnel for the treatment of the emergency medical condition, and has agreed to accept the transfer. 42 U.S.C. §

1395dd (c)(2)(A).

40.    The transfer by Mercy to WRMC was not an appropriate transfer, as defined by 42 U.S.C. §1395 dd(c)(2)(A), in that WRMC did not have available qualified personnel to treat Kimberly's emergency medical condition.  The transfer of Kimberly by Mercy to WRMC, therefore, was a clear violation of the mandatory requirements of EMTALA.

41.    Kimberly's loss of her lower left leg was a direct result of Mercy's inappropriate transfer Kimberly to WRMC, which was a violation of EMTALA.  Pursuant to 42 U.S.C. §1395 dd(d)(2)(A), Mercy is liable for those damages available for personal injury under Arkansas law.  All damages alleged herein are those available under Arkansas law.

42.    Mercy's statutory duty under EMTALA, and its liability for damages, is strict or absolute.

### COUNT II.

43.    Kimberly incorporates herein as a part of her claim against Mercy under Count II the foregoing allegations of paragraphs 1 through 36.

44.    Mercy, in its care and treatment of Kimberly, was obligated to possess and exercise that degree of skill, care and learning ordinarily

possessed and exercised by hospitals with an emergency department in Fort Smith, Arkansas or in similar communities.  A deviation from the standard of care constitutes negligence.

45.    Mercy deviated from the required degree of care in its treatment of Kimberly.  Mercy knew or reasonably should have known, it could not provide appropriate treatment for Kimberly's condition and that a transfer to another facility was essential, and that the time to receive appropriate treatment was critical.  Notwithstanding this knowledge, Mercy deviated from the standard of care in the following manner:

a.    Taking three hours, after the time sensitivity of Kimberly's condition was known, to effect her transfer;

b.    Failure to expeditiously  accomplish the transfer of Kimberly to a facility with the capability of treating her medical emergency;

c.    Transferring Kimberly to WRMC without ensuring that WRMC in fact was capable of treating the emergency medical condition;

d.    Ordering her transport by ground ambulance rather than by air;

17

e.    Failure to expeditiously do all things required prior to her

transfer to an appropriate medical facility;

## COUNT III.

46.    Kimberly incorporates herein as a part of her claims against

LAMMICO under Count III the foregoing allegations of paragraphs 1

through 36.

47.    LAMICCO was, at the times relevant herein, the liability insurer

for WRMC.  WRMC was a charity not subject to suit in tort.  LAMICCO

therefore, is subject to a direct action, and, is liable for all damages

proximately caused by the negligence, or fault, of agents or employees or

officers of WRMC while acting within the scope of their agency or

employment, as provided by Ark. Code Ann.§ 23-79-210.

48.    The occurrence described herein, and all damages resulting

therefrom by Kimberly, were proximately caused by the negligence of

LAMICCO's insured, WRMC.  This negligence consists of, but is not limited

to the following acts and omissions:

a.    Posting false and misleading information to the Call

Center system as regards its current ability to provide

18

services of a peripheral vascular surgeon;

b.    Failure to monitor information it submitted to the Call Center system concerning services it was currently able to provide;

c.    Failure to update information submitted to the Call Center system to ensure that it was accurate at any point in time;

d.    Breach of its contract with Arkansas Department of Health, whereby it undertook to maintain its information in the Call Center system to ensure its accuracy;

e.    To create and implement appropriate procedures for monitoring the accuracy of its information on the Call site system to ensure that it is both accurate and complete at any given point in time.

f.    Accepting transfer of Kimberly from Mercy without ascertaining that it had a qualified personnel qualified to treat Kimberly's emergency medical condition.

g.    Failure to post and maintain in the Emergency Department a list of medical specialists and sub-specialists as required by 42 U.S.C. § 1395cc (1)(I)(iii).

19

## COUNT IV.

49.    Kimberly incorporates herein as a part of her claim against LAMMICO under Count IV, by reference thereto, the foregoing allegations of paragraphs 1 through 36.

50.    LAMICCO's insured, WRMC, was, at all times, obligated to possess and exercise that degree of skill, care and attention ordinarily possessed and exercised by hospitals  providing emergency room services in Fayetteville, Arkansas, or similar communities.  Deviation from the required degree of skill and care constitutes negligence on the part of LAMICCO's insured, WRMC.

51.    Occurrences described herein, and all damages suffered by Kimberly were proximately caused by WRMC's deviation from the required standard of care.  This deviation consists of, but is not limited to the following acts and omissions:

    a.    Posting false and misleading information to the Call Center system as regards its current ability to provide services of a peripheral vascular surgeon;

    b.    Failure to monitor information it submitted to the Call Center system concerning services it was currently able

to provide;

c.  Failure to update information submitted to the Call Center system to ensure that it was accurate at any point in time;

d.  Breach of its contract with the Arkansas Department of Health, whereby it undertook to maintain its information in the Call Center system to ensure its accuracy;

e.  To create and implement appropriate procedures for monitoring the accuracy of its information on the Call Center site system to ensure that it is both accurate and complete at any given point in time.

f.  Accepting transfer of Kimberly without confirming that it had available physicians capable of treating her emergency condition;

g.  Failure to post and maintain in the emergency department, an accurate list of physician services available, as required by 42 U.S.C. § 1395cc (a)(I)(iii).

## COUNT V.

52.  Kimberly incorporates herein as a part of her claim against

21

Pece and Clinics under Count V, by reference thereto, the foregoing allegations of paragraphs 1 through 36.

53.    Pece was, in connection with her care and treatment of Kimberly, obligated to exercise ordinary care for the safety of Kimberly, or alternatively, to possess and exercise a degree of skill, care and learning ordinarily possessed and exercised by physicians providing emergency room serviced in Fort Smith, Arkansas, or similar community, a deviation from which a degree of care constitutes negligence.  Pece was negligent, or alternatively, deviated from the required degree of care, which was a proximate cause of the occurrence, and consequent damages of Kimberly.

54.    This negligence, or alternative deviation from the standard of care, consists of, but is not limited to, the following acts and omissions.

a.    Ordering Kimberly to be transferred to WRMC by ground ambulance, with the full knowledge and understanding of the critical time sensitivity of Kimberly's condition;

b.    Ordering Kimberly transferred from Mercy to WRMC without first receiving express confirmation that WRMC had available the appropriate physician services to treat her emergency medical condition.

22

55.    Pece was , at all times, an agent or employee of Mercy and Clinics, both of which are liable under principles of *respondeat superior*, for all damages proximately caused by the deviation from the standard of care and negligence.

### COUNT VI.

56.    Kimberly incorporates herein as a part of her claim against Bradshaw and Clinics under Count VI the foregoing allegations of paragraphs 1 through 36.

57.    Bradshaw, in connection with his care and treatment of Kimberly, was obligated to possess and exercise that degree of skill, care and learning ordinarily possessed and exercised by physicians providing emergency room services in Fort Smith, or similar communities.  The deviation from this standard of care constitutes negligence.

58.    Bradshaw, in his care and treatment of Kimberly, deviated from the standard of care, which deviation was a proximate cause of Kimberly's injuries and consequent damages.  This deviation consists of, but is not limited to:

a.    Failure to order the CTA of the leg on a stat basis, when he knew, or reasonably should have known, that

23

Kimberley's need for the services of a vascular surgeon was urgent;

b.   Failure to obtain express confirmation, while communicating with WRMC, that it had presently available the services of a peripheral vascular surgeon.

59.   Bradshaw was, at all times, an agent or employee of Mercy and Clinics, both of which are liable under principles of *respondeat superior,* for all damages proximately caused by the deviation for the standard of care and negligence.

## COUNT VII.

60.   The allegations of Count VII are pleaded in the alternative to the allegations against LAMMICO stated in Counts III and IV.  These allegations are pleaded in the alternative and are operative only in the event WRMC is determined not to be a charity immune from suit in tort, or in the event one or more of the claims asserted against LAMMICO are adjudged not to be with the coverage of its policy with WRMC.

61.   Subject to the qualification set forth in paragraph 60, Kimberly pleads against WRMC, all allegations of paragraphs 1 through 36 and 46 through 51 (Counts III and IV), which are incorporated herein by reference

thereto.

## COUNT VIII.

62.    The allegation of Count VIII are pleaded in the alternative to the allegations against Mercy and Clinics stated in Counts I and II, and Counts V and VI.  These allegations are pleaded in the alternative and are operative only in the event Mercy and Clinics, or one of them, are adjudicated to be immune from suit.

63.    Subject to the qualification set forth in paragraph 62, Kimberly pleads against any liability insurer or indemnitor of Mercy and Clinics, or one of them, all allegations of paragraphs 1 through Counts I, II, V and VI, which are incorporated herein by reference thereto.

64.    Kimberly does not know the identity of any liability insurers or indemnitors of Mercy who are identified herein as one or more of the John Doe Defendants.  Kimberly pleads against those John Does all allegations of paragraphs 1 through 45, which are incorporated herein by reference thereto.

65.    Kimberly does not know the identity of any liability insurers or indemnitors of Clinics who are identified herein as one or more of the John Doe Defendants.  Kimberly pleads against those John Does all allegations

of paragraphs 1 through 36 and 52 through 59 (Counts V and VI), which are incorporated herein by reference thereto.

WHEREFORE, Kimberly Ruloph, Plaintiff herein, demands judgment from and against LAMMICO d/b/a LAMMICO Risk Retention Group, Inc. (LAMMICO), Washington Regional Medical Center (WRMC), Mercy Hospital – Fort Smith (Mercy), Jody A. Bradshaw, M.D. (Bradshaw), Kristin Pece, M.D. (Pece); Mercy Clinic Fort Smith Communities (Clinics), Robert A. Irwin, M.D. (Irwin); and John Does 1-10, Defendants herein, jointly or severally, or severally, together with attorney fees, applicable statutory penalties, interest, and costs.

BY: _____

    H. David Blair
    Bar Number 65004
    Blair & Stroud
    P.O. Box 2135
    Batesville, Arkansas 72503
    870-793-8350    Phone
    870-793-3989    Facsimile
    hdb@blastlaw.com

    *Attorney for Kimberly Ruloph,*
    *Plaintiff*

## **DEMAND FOR JURY TRIAL**

Comes Kimberly Ruloph, Plaintiff herein, and, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands right of trial by jury as to all issues so triable.

BY: _____

H. David Blair
Bar Number 65004
Blair & Stroud
P.O. Box 2135
Batesville, Arkansas 72503
870-793-8350    Phone
870-793-3989    Facsimile
hdb@blastlaw.com

*Attorney for Kimberly Ruloph,
Plaintiff*