UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KIMBERLY RULOPH                                                                          PLAINTIFF

v.                                              No. 2:20-CV-02053

LAMMICO, et al.                                                                        DEFENDANTS

**OPINION AND ORDER**

Before the Court are four motions (Docs. 36, 40, 44, 50) for judgment on the pleadings and four briefs in support (Docs. 37, 42, 45, 51) filed by the Separate Defendants.[1] Plaintiff filed a response (Doc. 52) and brief in support (Doc. 53) to the motion for judgment on the pleadings (Doc. 36), which she adopted (Docs. 56, 58, 60) as responses to the remaining motions. Dr. Irwin and LAMMICO filed a reply (Doc. 62).[2] For the reasons set forth below, the motions will be DENIED.

**I.     Background**

On April 15, 2018, Plaintiff Kimberly Ruloph tripped and fell and dislocated her left knee. An ambulance transported Ms. Ruloph to the hospital and the ambulance records documented Ms. Ruloph had lost a "palpable dorsal and posterior pedal pulse." (Doc. 35, ¶ 19). Ms. Ruloph alleges the loss of pulse demonstrated the loss of blood flow to her lower leg and she had only a six-hour window to restore blood flow to the leg or amputation would be necessary. Ms. Ruloph was taken to the emergency department at Mercy Hospital-Fort Smith ("Mercy") and was examined by Dr.

---

[1] Separate Defendants Dr. Robert Irwin and LAMMICO filed a motion (Doc. 36) and brief in support (Doc. 37). Defendant Mercy Hospital filed a motion (Doc. 40) and brief in support (Doc. 42). Defendant Dr. Jody Bradshaw file a motion (Doc. 44) and a brief in support (Doc. 45). Defendants Mercy Clinics and Dr. Kristin Pece filed a motion (Doc. 50) and brief in support (Doc. 51).

[2] Defendants Mercy Clinics, Dr. Kristin Pece, Dr. Bradshaw, and Mercy Hospital filed motions to adopt the reply (Doc. 63, 64, 65), which the Court granted (Doc. 66).

1

Pece who allegedly determined Ms. Ruloph had an emergency medical condition.

Dr. Pece then requested a consult from Dr. Bradshaw, an orthopedic surgeon at Mercy. Dr. Bradshaw performed a manipulation to reduce Ms. Ruloph's dislocation, and at 1:05 pm noted Ms. Ruloph did not have detectible blood flow. Because of the lack of blood flow, it was determined that a peripheral vascular surgeon was needed. Mercy did not have a peripheral vascular surgeon and contacted the Arkansas Trauma Call System for directions on where to transfer Ms. Ruloph. The call system informed Mercy that Washington Regional Medical Center ("WRMC") in Fayetteville, Arkansas, had a peripheral vascular surgeon. Dr. Bradshaw then called Dr. Irwin at WRMC and allegedly informed Dr. Irwin of Ms. Ruloph's injuries, specifically that she did not have a pulse in her lower leg. Dr. Irwin accepted the transfer of Ms. Ruloph. Despite Dr. Irwin's statement accepting the transfer, the pleadings are unclear about whether anyone at Mercy obtained an express determination that WRMC had a peripheral vascular surgeon.

At 1:37 pm, orders were put in to transfer Ms. Ruloph to WRMC. After discussing the necessity and risks of a transfer, Ms. Ruloph executed a consent to the transfer and was placed in an ambulance for an hour-long transport to WRMC. Sometime during Ms. Ruloph's transport, Mercy was notified that WRMC did not have a peripheral vascular surgeon and a decision was made to medflight Ms. Ruloph to Mercy Hospital in Springfield, Missouri upon her arrival at WRMC. Ms. Ruloph arrived at WRMC and was then flown to Mercy Hospital in Springfield. A peripheral vascular surgeon performed surgery on Ms. Ruloph in an attempt to save her leg, but because of the length of time her leg was without blood flow, Ms. Ruloph's leg had to be amputated above the knee.

Ms. Ruloph filed an amended complaint against LAMMICO, Mercy Hospital Fort Smith, Dr. Jody Bradshaw, Dr. Kristin Pece, Mercy Clinic Fort Smith Communities, Dr. Robert Irwin,

and John Does 1-20 asserting claims for medical malpractice against, negligence, and a claim against Mercy arising under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §1395dd. Defendants' motions for judgment on the pleadings argue Ms. Ruloph's EMTALA claim must be dismissed because Ms. Ruloph has failed to plead facts showing an EMTALA violation premised on failure to transfer. Defendants' motions further argue the amended complaint should be dismissed for lack of subject matter jurisdiction because without the EMTALA claim the Court should decline to exercise supplemental jurisdiction. Defendants argue in the alternative on this point that the state law claims are not part of the same case or controversy such that the Court can exercise supplemental jurisdiction.

## II.     Legal Standard

When considering a Rule 12(c) motion for judgment on the pleadings, the Court uses the same standard as that for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Ashely Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Judgment on the pleadings is appropriate "only if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). The Court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quoting *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). Pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of the cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2009).

**III.     Analysis**

EMTALA applies to hospitals that have executed a provider agreement under the Medicare program. *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996). The purpose of EMTALA is to address the problem of patient dumping, which happens when hospitals refuse to treat patients in an emergency room if the patients do not have health insurance. *Id.* at 1136-37. EMTALA requires hospitals to screen and stabilize patients who come to the emergency room. *Id.* Under a failure to screen claim a plaintiff must show a hospital did not apply the same screening procedures to him that the hospital applies to similarly situated patients, and that this had a disparate impact on the plaintiff. *Id.* Patients are not entitled to correct or non-negligent treatment under EMTALA, but rather to be treated the same as other similarly situated patients. *Id.*

EMTALA also requires a hospital to provide the treatment required to stabilize the patient or transfer a patient if the hospital determines the patient has an emergency medical condition. *Id.* at 1140. "Emergency medical condition" is defined in the statute as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A). A plaintiff must show the hospital actually knew that the patient suffered from an emergency medical condition. *Summers*, 91 F.3d at 1140. If a patient is not stabilized, the patient can only be transferred if

> the individual makes a written request for transfer to another hospital or a physician has signed a certification that based on the medical information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and the transfer is an appropriate transfer.

4

*Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F.Supp.2d 464, 478-79 (S.D. Tex. 2009) (internal citations and alterations omitted). The transfer requirements under EMTALA do not have to be satisfied if the patient is stabilized. *Id.*

If the hospital transfers the patient, the transfer must be an appropriate transfer. An appropriate transfer is defined as a transfer

> (A) in which the hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health . . .; (B) in which the receiving facility – (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreement to accept transfer of the individual and to provide appropriate medical treatment; (C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of transfer . . .; (D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medical appropriate life support measures during the transfer; and (E) which meets such other requirements as the Secretary may find necessary in the interests of the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2). Thus, the elements for an EMTALA transfer claim are "(1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) the transferring hospital did not obtain the proper consent or certification before transfer and failed to follow appropriate transfer procedures." *Guzman*, 637 F.Supp.2d at 510. "Stabilize" means to provide medical treatment of the emergency medical condition "as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer." 42 U.S.C. § 1395dd(e)(3)(A).

Defendants argue Plaintiff's EMTALA claim cannot succeed because Plaintiff has not alleged Mercy failed to stabilize Ms. Ruloph, and if a patient is stabilized, the transfer requirements of EMTALA do not apply. Although the transfer form stated Ms. Ruloph was stable, the amended

complaint alleges facts demonstrating that the prolonged lack of blood flow to Ms. Ruloph's leg would result in an amputation. Because there was a small window of time to restore the blood flow, Ms. Ruloph was not stabilized in a way that no material deterioration of the condition was likely. Accepting as true all facts pled and weighing all inferences in the favor of the plaintiff, as required at this stage, the amended complaint does allege Ms. Ruloph was not stabilized at the time of the transfer.

Defendants also argue Ms. Ruloph's EMTALA claim against Mercy should be dismissed because Mercy's decision to transfer Ms. Ruloph to WRMC was based on Mercy's understanding that WRMC had a peripheral vascular surgeon. The Court agrees with Defendants' arguments that EMTALA is based on actual knowledge. However, there are questions of fact and inferences to be drawn that must presently weigh in Plaintiff's favor, particularly regarding the phone call between Dr. Iwrin and Dr. Bradshaw and what knowledge Mercy had as a result of the phone call. When all reasonable inferences are given in her favor, because Plaintiff has alleged facts sufficient to state a cause of action under EMTALA, Defendants' motions will be denied.[3]

The Court has subject matter jurisdiction over Ms. Ruloph's EMTALA claim under 28 U.S.C. § 1331, and is exercising supplemental jurisdiction over Ms. Ruloph's state law claims pursuant to 28 U.S.C. § 1367(a). Defendants argue that if the Court finds Ms. Ruloph properly pled an EMTALA claim, the state law claims should be dismissed because they do not arise out of the same case or controversy as the EMTALA claim. "Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.'" *ABF Freight*

---

[3] Though the Court will not bifurcate discovery in this litigation, because EMTALA provides the jurisdictional key to the courthouse doors, the parties are encouraged to be expeditious in exchanging discovery relevant to the EMTALA claim and in presenting potentially dispositive motions on that issue.

6

*Sys, Inc. v. Int'l Broth of Teamsters*, 645 F.3d 954, 964 (8th Cir. 2011) (citing *Myers v. Richland Cnty*, 429 F.3d 740, 746 (8th Cir. 2005)). "[C]laims derive from a common nucleus of operative fact if the 'claims are such that [the claimant would ordinarily be expected to try them all in one judicial proceeding." *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 350 (8th Cir. 2007) (citing *Myers*, 429 F.3d at 746). This "ordinary expectation" is "considered without regard to their federal or state character." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

Defendants argue the state law claims do not derive from a common nucleus of operative fact because Mercy and WRMC are located in different counties, and WRMC's conduct occurred in Washington County, Arkansas, while Mercy's conduct occurred in Sebastian County, Arkansas. In Arkansas state court, venue for medical malpractice claims exists where the alleged act or omission occurred. Ark. Code Ann. § 16-60-105. Defendants' argument is that because the plaintiff could never try these claims together in state court, they cannot derive from a common nucleus of operative fact. Defendants further argue the negligence claim against LAMMICO cannot derive from a common nucleus of operative fact because the direct negligence action against LAMMICO would be subject to the Arkansas venue provision in Ark. Code Ann. § 23-79-204. Under Ark. Code Ann. § 23-79-204, venue is proper in the county where the injury occurred or where the plaintiff resided. Defendants argue the injury for venue purposes is Ms. Ruloph's amputation and because the amputation occurred in Missouri, Arkansas's venue statutes would not allow the direct negligence claim against LAMMICO to be in the same judicial proceeding as the medical malpractice claims against the Sebastian County Defendants.

The venue statutes Defendants reference are found in Arkansas state statutes governing civil procedure in the state of Arkansas. Federal law controls federal venue and 28 U.S.C. § 1391(b) provides that a civil action may be brought in a "judicial district in which any

defendant resides, if all defendants are residents of the state" or "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Because a substantial part of the events alleged occurred in Sebastian County and Washington County, which are both within the Western District of Arkansas, venue is proper in this district. Although a claimant who brings suit in Arkansas state court may not be able to try these claims in one proceeding due to procedural statutes enacted to benefit defendants in medical malpractice claims, a claimant who could bring any of these claims in an original action in federal court would certainly expect to try all of them together. Therefore, the claims arise from a common nucleus of operative fact and the Court will continue to exercise supplemental jurisdiction.

IT IS THEREFORE ORDERED that Defendants' motions for judgment on the pleadings (Docs. 36, 40, 44, 50) are DENIED.

IT IS SO ORDERED this 24th day of July, 2020.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE