```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF ARKANSAS
 2                         FORT SMITH DIVISION

 3


 4   KIMBERLY RULOPH                                    PLAINTIFF

 5
          V.              No. 2:20-CV-02053-PKH
 6


 7   LAMMICO d/b/a LAMMICO                             DEFENDANTS
     RISK RETENTION GROUP, INC.;
 8   MERCY HOSPITAL - FORT SMITH;
     JODY BRADSHAW, M.D.;
 9   KRISTIN PECE, M.D.; MERCY CLINIC
     FORT SMITH COMMUNITIES; ROBERT A. IRWIN, M.D.;
10   and JOHN DOES 2-10
                          - - - - - - - - - -
11
                            JODY BRADSHAW,
12                  taken at Hardin, Jesson and Terry
                5000 Rogers Avenue, Fort Smith, Arkansas
13                    taken on November 10, 2020


14


15   APPEARANCES                                    ON BEHALF OF:

16   MR. H. DAVID BLAIR                                 PLAINTIFF
     MR. PAUL WACKER
17   Blair & Stroud
     P.O. Box 2135
18   Batesville, Arkansas  72503-2135

19   MR. PAUL MCNEILL                                   DEFENDANT
     Reece, Moore, McNeill
20      Pendergraft
     710 Windover Road, Suite B
21   Jonesboro, Arkansas  72401

22                                              **EXHIBIT A**

23

24                      KRISTIE KNIGHT, CCR
                     KNIGHT COURT REPORTING, INC.
25          P.O. BOX 1142, FORT SMITH, ARKANSAS  72902
```

1  negative Doppler, what conclusion did you reach?
2  A   I felt that there had been compromise of flow distally to
3  the foot.  I felt that she had a vascular injury of some sort.
4  Q   Okay.  In cases of a pulseless limb, lower extremity, is
5  there any recognized time frame in which you have a -- a
6  patient has a reasonable chance of having her condition
7  successfully treated?
8  A   I don't know of an absolute agreed-upon time frame
9  either.  I know that you want to restore flow quickly.
10 Q   Fast as possible?
11 A   As fast as possible.  Yes, sir.
12 Q   Is -- is a six-hour rule often mentioned or observed in
13 by -- in the medical profession?
14 A   I didn't have any experience in vascular surgery as a
15 resident or since I've been out.  I heard from the deposition
16 earlier this morning a mention of the six-hour rule, but I
17 haven't been taught that as a rule burned into my -- my --
18 Q   Okay.  So vascular surgery is out of your area?
19 A   Yes, sir.  Absolutely.
20 Q   And as far as the critical time window, I take it you
21 would defer to the judgment of a vascular surgeon?
22 A   Yes, sir.  I think that would be appropriate.
23 Q   Okay.  So you successfully reduced Kimberly's knee
24 dislocation, and you couldn't palpate a pulse, a Doppler
25 didn't show up one -- what was your decision as to what needed

1  to be done at that point?
2  A   I first splinted her knee with a brace so that it
3  couldn't re-dislocated.
4  Q   Right.
5  A   I got an X-ray to assure that what my hands felt were an
6  appropriate reduction was actually an appropriate reduction
7  with the X-ray.
8  Q   And it turned out it was?
9  A   Yes, sir.
10 Q   Okay.
11 A   And then I ordered a CT Angiogram Study to evaluate the
12 vessel behind the knee.
13 Q   Did you order the CT Angiogram Study before the decision
14 was made to contact Trauma Com?
15 A   Yes, sir, I believe that is true.
16 Q   And what was the purpose for the -- ordering the CT
17 Angiogram?
18 A   I felt like there could be several reasons that flow was
19 interrupted to her foot.  It could be a complete transection
20 of the vessel or it could be a pseudoaneurysm of the vessel,
21 where it bleeds between the walls of the vessel and occludes
22 it, or it could be an occluding hematoma from leakage from the
23 vessel.  So my goal in ordering the Angiogram was to precisely
24 determine why flow was not getting to the foot that I could
25 feel or test.

1  Q    Were any of those potential conditions those that Mercy
2  was capable of treating?
3  A    At that time when I ordered the test, I didn't know
4  exactly what our capabilities of treating were, which is why I
5  called Dr. Taggarse.  He was our cardiovascular surgeon on
6  call, and asked if he was capable of treating that injury, and
7  he told me that he was not.  That he only focused in the
8  chest.
9  Q    And did Dr. Taggarse -- is that how it --
10 A    Yes, sir.
11 Q    Did Dr. Taggarse tell you in that call that she needed to
12 see a peripheral vascular surgeon?
13 A    I don't remember the exact words that he used, but that
14 was my understanding from the call is that not a chest-focused
15 vascular surgeon, a peripheral vascular surgeon would be who
16 would perform that procedure.
17 Q    Okay.  And such a person was not available at Mercy as of
18 that time?
19 A    Yes, sir.  That was my understanding.
20 Q    Okay.  After determining that Mercy did not have
21 available someone to treat vascular problems to the extremity,
22 what purpose did the CT Angiogram serve?  If it is a
23 contention you can't treat it, why take the time to do it?
24 A    I felt like I was saving her time when she arrived to the
25 facility that did have a vascular surgeon, because I felt like

1  Mercy, were you involved in it at that point?
2   A   Yes, sir.  I spoke with Dr. Irwin at Washington Regional.
3   Q   Okay.  And was that the call that Trauma Com made to
4  Washington Regional and then Mercy was called?
5   A   I don't recall exactly how.
6   Q   The mechanics of it?
7   A   Yes, sir.  How it was patched together.
8   Q   But --
9   A   I was handed the phone and Dr. Irwin was on it.
10  Q   Okay.  Have you looked at any transcripts of that
11 telephone conversation?
12  A   Yes, sir, I have read the transcript.
13  Q   And the written transcript that you had, is that one you
14 prepared, is that one that came to you through this litigation
15 process?
16  A   I had -- I had nothing beforehand.  It was during the
17 review with my attorney of the medical record that that
18 transcript was brought to my attention.
19  Q   Okay.
20          MR. BLAIR:  Kirk, is that the transcript that we
21 furnished?
22          MR. DOUGHERTY:  I believe it was, David.  But to
23 tell you for certain that it was yours or mine, I don't know.
24          MR. BLAIR:  Okay.
25          MR. DOUGHERTY:  But --

1    Q    The transcript you reviewed was -- did it accurately
2    reflect the conversation you had with Dr. Irwin as you recall
3    it?
4    A    As I remember.  Yes, sir.
5    Q    Okay.  And in that conversation, did Dr. Irwin ever
6    represent that Washington Regional had a vascular surgeon
7    available?  Peripheral vascular surgeon?
8    A    Sure.  So in the conversation between Dr. Irwin and
9    myself, I accurately described the patient's injury and the
10   intervention that she needed.  And Dr. Irwin felt like they
11   were capable of providing that service in accepting her to his
12   facility.
13   Q    Okay.
14   A    And so I felt assured that they had that service
15   available.
16   Q    Did Dr. Irwin not ask during the telephone call to
17   someone in where he was -- whether a cardiovascular surgeon
18   was available?
19   A    So I saw in the transcript where Dr. Irwin had asked what
20   was available, but it wasn't something that I heard in the
21   call when we were on the line together.
22   Q    Okay.
23   A    At the time.  And I'm not sure the transcript --
24   Q    That -- that didn't happen when you were on the line?
25   A    No, sir.  I think --

1   Q   Okay.  But while you were on the line, did he ever
2   expressly say that we have a vascular surgeon available to
3   treat this lady?
4   A   I can't remember him using those exact words.  But I did
5   feel that he understood well that she needed a vascular
6   surgeon, and that was the whole point of the transfer.  So his
7   acceptance of her, to me, made me feel assured that a vascular
8   surgeon was available there to take care of her.
9   Q   Didn't need a cardiovascular surgeon because you already
10  had one of those in Fort Smith.
11  A   Our -- we did have a cardiovascular surgeon in Fort Smith
12  who told me that he didn't do any peripheral work.  But I
13  don't know if that is true for all cardiovascular surgeons.
14  Q   All right.
15  A   I don't know if some cardiovascular surgeons also operate
16  on peripheral limbs.  But I don't know for sure.
17  Q   Okay.  So let me make sure -- see if I'm correctly
18  interpreting your testimony.  As I understand it, you were
19  relying upon Dr. Irwin doing whatever was necessary to
20  determine that Washington Regional was appropriately staffed?
21          MR. DOUGHERTY:  Object to form.  Go ahead.
22  A   I felt like Washington Regional was appropriately staffed
23  both by Trauma Com directing us to them, as who would best and
24  closest provide the care that she needed.  And Dr. Irwin's
25  understanding of her injury and what intervention was needed

1   and his acceptance of her, were the two things that made me
2   feel good about the transfer to there.
3   Q   Okay.  So you were relying upon the accuracy of Trauma
4   Com's direction?
5   A   Both that combined with my conversation with the
6   accepting physician at the -- at the next facility.
7   Q   Right.  And if, in fact, the term peripheral vascular
8   surgeon was never used, it was your belief that he had done
9   whatever is necessary to assure that he could -- Washington
10  Regional was an appropriate facility for her?
11          MS. CARITHERS:  Object to the form.
12  A   I believed that he understood the situation well and that
13  he was a competent provider and that he would have made sure
14  that they could provide those services before he accepted a
15  patient coming there, specifically for the reason to get that
16  service.  Yes, sir.
17  Q   Okay.  And it was upon that belief or assumption,
18  whatever you want to call it, that you ordered the transfer or
19  agreed to the transfer?
20          MR. DOUGHERTY:  Form.  Go ahead.
21  A   That is -- that is why I felt like the transfer was
22  appropriate.  Yes, sir.
23  Q   Okay.  And so the -- according to the records, she left
24  Mercy at 2:55 p.m.
25  A   Yes, sir.

1  Q  Okay. Based upon what knowledge you have of vascular
2  compromise, do you have any opinion as to how long she had at
3  that point to restore blood flow in order to have a reasonable
4  chance of salvaging the limb?
5        MR. MCNEILL: Object to form.
6  A  I don't feel suited to provide an opinion on how long
7  that she had because it is outside of my area of expertise. I
8  wasn't certain.
9  Q  Again, you would, I take it, defer to a vascular surgeon
10 on questions of that nature?
11 A  I don't know that I would refer to a single vascular
12 surgeon because no one physician knows the gold standard
13 answer for every problem.
14 Q  Right.
15 A  I believe an agreement upon many vascular surgeons would
16 be able to provide a reasonable estimate of time. But even in
17 that case, every case is different. Whether it is a
18 transection or a hematoma or a pseudoaneurysm, or is the
19 patient a smoker. I think all of those things would change
20 that time number about how long that particular patient had.
21 Q  All right. And the time frame is -- if there is a time
22 frame, would be something derived from experience, I take it,
23 of the -- of whatever speciality was involved?
24 A  That and the academic literature.
25 Q  All right. And all of which are outside of your area of

1  practice.  That is, the vascular surgery literature, the
2  vascular studies and all of that, I take it?
3  A   Yes, sir.  That is true.
4  Q   And in terms of how much time she had to save her limb
5  from her departure of Mercy or from any other point, would be
6  a matter that you would defer to the learning of vascular
7  surgery for the answer?
8          MR. DOUGHERTY:  Object to form.  Go ahead.
9  A   What I knew I needed to do was work quickly.  To get
10 there quickly.  Address her needs that I could address as
11 quickly as possible.  Diagnose her problem as quickly as
12 possible and get her to the appropriate treating physician as
13 quickly as possible.
14 Q   So speed in getting her to an appropriate physician was
15 your -- your guiding star throughout the whole process?
16         MR. DOUGHERTY:  Form.
17 A   Both speed and accuracy.
18 Q   Right.
19 A   Speed at the -- forsaking accuracy is no good.  But --
20 yes, sir.
21 Q   Accurate speed, then?
22 A   Sure.
23 Q   Okay. After she departed Mercy, have you -- did you have
24 any further dealings with her?
25 A   No, sir.

1                    C E R T I F I C A T E

2

3   STATE OF ARKANSAS       )
                            )SS
4   COUNTY OF SEBASTIAN     )

5

6           I, Kristie Knight, a Certified Court Reporter, in
    and for Sebastian County, Arkansas, do hereby certify that the
    witness, **JODY BRADSHAW**, was duly sworn by me prior to the
7   taking of testimony as to the truth of the matters attested to
    and contained therein; that the testimony of said witness was
8   taken by me by Stenomask and was thereafter reduced to
    typewritten form by me or under my direction and supervision;
9   that the foregoing transcript is a true and accurate record of
    the testimony given to the best of my understanding and
10  ability.

11          I FURTHER CERTIFY that I am neither counsel for,
    related to, nor employed by any of the parties to the action
12  in which this proceeding was taken; and, further, that I am
    not a relative or employee of any attorney or counsel employed
13  by the parties hereto, nor financially interested, or
    otherwise, in the outcome of this action; and that I have no
14  contract with the parties, attorneys, or persons with an
    interest in the action that affects or has a substantial
15  tendency to affect impartiality, that requires me to
    relinquish control of an original deposition transcript or
16  copies of the transcript before it is certified and delivered
    to the custodial attorney, or that requires me to provide any
17  service not made available to all parties to the action.

18

19

20                              _____

21                              Kristie Knight, CCR
                                Certified Court Reporter
22                              Certificate No. 649

23

24

25