```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF ARKANSAS
 2                         FORT SMITH DIVISION

 3


 4   KIMBERLY RULOPH                                       PLAINTIFF

 5
         V.              No. 2:20-CV-02053-PKH
 6


 7   LAMMICO d/b/a LAMMICO                                DEFENDANTS
     RISK RETENTION GROUP, INC.;
 8   MERCY HOSPITAL - FORT SMITH;
     JODY BRADSHAW, M.D.;
 9   KRISTIN PECE, M.D.; MERCY CLINIC
     FORT SMITH COMMUNITIES; ROBERT A. IRWIN, M.D.;
10   and JOHN DOES 2-10
                          - - - - - - - - - -
11                    The Telephone Deposition of
                            ROBERT A. IRWIN,
12            taken at Carithers, Johnson, Devenport
              3900 Front Street, Fayetteville, Arkansas
13                    taken on November 11, 2020

14


15   APPEARANCES                                       ON BEHALF OF:

16   MR. H. DAVID BLAIR                                    PLAINTIFF
     MR. PAUL WACKER
17   Blair & Stroud
     P.O. Box 2135
18   Batesville, Arkansas  72503-2135

19   MR. PAUL MCNEILL                                      DEFENDANT
     Reece, Moore, McNeill
20      Pendergraft
     710 Windover Road, Suite B
21   Jonesboro, Arkansas  72401

22                                                      EXHIBIT G

23

24                   KRISTIE KNIGHT, CCR
                  KNIGHT COURT REPORTING, INC.
25        P.O. BOX 1142, FORT SMITH, ARKANSAS  72902
```

1  transcript of the conversation as far as you can tell us?
2  A   You know, I really -- that has been over two years, I --
3  I mean, it's a recording and it seems to be a pretty good
4  transcript of it.  They did put -- when I asked if -- when I
5  asked if we had ICU beds, they put me on ICU bags.
6  Q   Okay.
7  A   But it seems to be pretty accurate.  I --
8  Q   Okay.  Doctor, let me direct this question to your
9  attorney.
10         MR. BLAIR:  Was this the transcript that we produced
11 as far as our copies of Production?
12         MS. CARITHERS:  Yes, it is.
13         MR. BLAIR:  Okay.  Since we're not in the same room,
14 I needed to make sure we were talking about the same
15 transcript.  Okay?
16         REPORTER:  David, Glenn has arrived now.  I have
17 Glenn here.  We took him off the phone.
18         MR. BLAIR:  Okay.  Welcome, Glenn.
19         MR. RITTER:  Thank you.  I appreciate you guys
20 accommodating me.  And I am sorry.  I just wanted to drive and
21 see as much of Arkansas as I could this morning.  So --
22         MR. MCNEILL:  He was getting his morning drive in.
23         MR. BLAIR:  Okay.
24 **BY MR. BLAIR(CONTINUING:)**
25 Q   When you got the call from Dr. Bradshaw, Dr. Irwin, did

1   he tell you that he was calling about a woman who had suffered
2   a fall?  Excuse me?
3    A   Yes.
4    Q   Okay.  And did he tell you that she had suffered a
5   dislocation in the fall of her knee -- left knee?
6    A   Yes.
7    Q   And that he, Dr. Bradshaw, had been able to reduce the
8   dislocation?
9    A   Yes.
10   Q   Did she -- did he also tell you she had sustained a loss
11   of circulation -- of detectable circulation below the knee?
12   A   Yes.
13   Q   And that the reduction of the dislocation did not restore
14   a palpable blood flow?
15   A   Yes.
16   Q   And that she needed the services of a peripheral vascular
17   surgeon?
18   A   I -- that sounds -- that sounds correct.
19   Q   Okay.  And that one was not available at Mercy in Fort
20   Smith?
21   A   That -- well, you're paraphrasing, but I -- that is
22   basically correct.
23   Q   Okay.  So you understood the nature of the problem and
24   the type of specialist that she needed and that Mercy needed
25   to transfer her to somewhere to receive that treatment?

```
 1    A    That is -- that is right.
 2    Q    Okay.  And according to the recording that we just
 3   referenced, you asked someone before accepting the patient if
 4   a cardiovascular surgeon was available?
 5    A    Yes.
 6    Q    Should the question not have been whether a peripheral
 7   vascular surgeon was available?
 8    A    I -- well, I -- I can't answer that.  I just -- we have a
 9   vascular surgeon.
10    Q    Okay.  A cardiovascular surgeon?
11    A    Cardiovascular surgeon.
12    Q    Okay.  And what -- refresh my memory.  What was his name?
13    A    Dr. Jaggers.
14    Q    Can you spell his last name for us?
15    A    Well, not really.
16    Q    Okay.
17    A    I'm not sure if it starts with a Y or a J.
18    Q    Okay.  I will spell it phonetically, then.
19    A    Okay.
20    Q    Did you speak with Dr. Jaggers before accepting
21   Kimberly's transfer?
22    A    No.
23    Q    Okay.  And you did, in fact, accept her transfer to
24   Washington Regional?
25    A    What did you just say?
```

1   Q   You did, in fact, accept her transfer to Washington
2   Regional from Mercy?
3   A   Yes.
4   Q   Okay. And according to the tape, you did that within
5   seconds after asking whether there was a cardiovascular
6   surgeon available?
7   A   Yes.
8   Q   And you were -- you were accepting her transfer on behalf
9   of Washington Regional Medical Center?
10  A   Yes.
11  Q   After that -- after you accepted the transfer in that
12  telephone call, what was your next activity as in regards to
13  Kimberly Ruloph?
14  A   Well, the next thing was that I got a call from Dr. Pece.
15  Q   Okay. And tell us about that call.
16  A   Well, the -- I mean, the -- I have the transcript. I've
17  seen the transcript that has been provided. But as I recall,
18  they had completed a CT Angiogram and it showed no blood flow
19  to the lower leg.
20  Q   Right. And do you -- was there a request -- was that
21  call a request or simply informing you of her current status?
22  What was the purpose of it as far as you could determine?
23  A   Well, she wanted to let us know the result of the CT
24  Angiogram.
25  Q   Okay. And was that before or after Dr. Jaggers declined

```
 1   to treat Kimberly?
 2    A   Well, I talked to Dr. Jaggers, oh, you know, maybe five
 3   minutes after the call with Dr. Pece.
 4    Q   Was that the first call?
 5    A   Well --
 6    Q   Or the second call?
 7            MS. CARITHERS:  We couldn't hear you, David.  Can
 8   you restate that?  We can't hear you.
 9            MR. BLAIR:  Yes.
10            REPORTER:  Was that the first call or his -- the
11   second call?
12    A   Yeah.  Well, that was after the call from Dr. Pece.  The
13   first call was from Dr. Bradshaw.
14    Q   Very good.  So your first communication with Jaggers was
15   five minutes or so after Dr. Pece called you?
16    A   That is right.
17    Q   Up until then, you had had no communication with Dr.
18   Jaggers at all, I take it, in regards to Kimberly Ruloph?
19    A   That is correct.
20    Q   And what -- what did you communicate to Dr. Jaggers and
21   what did he communicate back to you?
22    A   Well, I explained to him what Dr. Pece had said and with
23   the dislocation and the -- and the laceration of the artery.
24   And so consulted with him and he -- his determination was that
25   this was too complicated for us to take care of.  It would
```

```
 1   require external fixation and that we -- that Washington
 2   Regional can't handle it.  It was too complicated a surgery.
 3   Q   By external fixation, you mean, external fixation of the
 4   knee?
 5   A   Right.
 6   Q   Okay.  And that would be an orthopedic procedure?
 7   A   Right.
 8   Q   Okay.  And how many orthopedic surgeons did you -- were
 9   on call as of that time at Washington Regional?
10   A   Well, there would have been one on call.
11   Q   Okay.  Was -- do you know if Dr. Jaggers ever consulted
12   with the orthopedic surgeon to see if he would be willing to
13   undertake the orthopedic aspect of her care?
14   A   I don't believe he did.
15   Q   Okay.  Incidentally, is Dr. Jaggers also an employee of
16   Washington Regional?
17   A   I don't know the answer to that.
18   Q   Okay.
19   A   I doubt it, but I don't know have -- I don't know the
20   answer.
21   Q   Okay.  So five minutes or so after Dr. Pece calls you,
22   you talk to Jaggers and he declined to accept Kimberly's
23   treatment?
24   A   Well, he said it was too complicated for the Washington
25   Regional to handle.
```

24

1   Q   Okay.  Well, did he -- did he agree to accept her
2 treatment, her as a patient or not agree?
3   A   Well, I'm not sure what your definition -- you know,
4 your, I'm not sure exactly what you're saying here.  But I
5 consulted with him on her case, and he felt that it was too
6 complicated for us.
7   Q   He was unwilling to undertake her treatment, I take it?
8   A   Well, he felt it was too complicated for Washington
9 Regional.
10   Q   And had -- at that point, what -- what did you do?
11   A   I asked the nurse to -- to contact the doctor that I
12 talked to.
13   Q   That is Pece?
14   A   Well, actually, I ended up talking to Dr. Bradshaw.
15   Q   Okay.
16   A   I -- I mean, that is my memory.
17   Q   All right.
18   A   It is -- there is no record of that phone call, but, you
19 know, I explained the situation, and apparently the patient
20 had already left by the time I got ahold of him.
21   Q   Okay.  Dr. Irwin, do you know as of April 15, 2018,
22 whether a vascular surgeon was on -- a peripheral vascular
23 surgeon was on staff at Washington Regional?
24   A   Well, the only thing we had was a cardiovascular surgeon.
25   Q   Okay.  You did not have anyone who was specifically a

```
 1                    C E R T I F I C A T E

 2


 3   STATE OF ARKANSAS      )
                            )SS
 4   COUNTY OF SEBASTIAN    )

 5

             I, Kristie Knight, a Certified Court Reporter, in
 6   and for Sebastian County, Arkansas, do hereby certify that the
     witness, ROBERT A. IRWIN, was duly sworn by me prior to the
 7   taking of testimony as to the truth of the matters attested to
     and contained therein; that the testimony of said witness was
 8   taken by me by Stenomask and was thereafter reduced to
     typewritten form by me or under my direction and supervision;
 9   that the foregoing transcript is a true and accurate record of
     the testimony given to the best of my understanding and
10   ability.

11           I FURTHER CERTIFY that I am neither counsel for,
     related to, nor employed by any of the parties to the action
12   in which this proceeding was taken; and, further, that I am
     not a relative or employee of any attorney or counsel employed
13   by the parties hereto, nor financially interested, or
     otherwise, in the outcome of this action; and that I have no
14   contract with the parties, attorneys, or persons with an
     interest in the action that affects or has a substantial
15   tendency to affect impartiality, that requires me to
     relinquish control of an original deposition transcript or
16   copies of the transcript before it is certified and delivered
     to the custodial attorney, or that requires me to provide any
17   service not made available to all parties to the action.

18

19

20                                  _____

21                                  Kristie Knight, CCR
                                    Certified Court Reporter
22                                  Certificate No. 649

23

24

25
```