```
 1                IN THE UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF ARKANSAS
 2                         FORT SMITH DIVISION

 3

 4    KIMBERLY RULOPH                                     PLAINTIFF

 5
         V.              No. 2:20-CV-02053-PKH
 6

 7    LAMMICO d/b/a LAMMICO                              DEFENDANTS
      RISK RETENTION GROUP, INC.;
 8    MERCY HOSPITAL - FORT SMITH;
      JODY BRADSHAW, M.D.;
 9    KRISTIN PECE, M.D.; MERCY CLINIC
      FORT SMITH COMMUNITIES; ROBERT A. IRWIN, M.D.;
10    and JOHN DOES 2-10
                            - - - - - - - - - -
11
                              KRISTEN PECE,
12                 taken at Hardin, Jesson and Terry
                5000 Rogers Avenue, Fort Smith, Arkansas
13                     taken on November 10, 2020

14

15    APPEARANCES                                    ON BEHALF OF:

16    MR. H. DAVID BLAIR                                  PLAINTIFF
      MR. PAUL WACKER
17    Blair & Stroud
      P.O. Box 2135
18    Batesville, Arkansas  72503-2135

19    MR. PAUL MCNEILL                                    DEFENDANT
      Reece, Moore, McNeill
20       Pendergraft
      710 Windover Road, Suite B
21    Jonesboro, Arkansas  72401

22

23

24                       KRISTIE KNIGHT, CCR
                     KNIGHT COURT REPORTING, INC.
25            P.O. BOX 1142, FORT SMITH, ARKANSAS  72902
```

**EXHIBIT K**

1   Was it -- at some point was it ascertained that there was not
2   a peripheral vascular surgeon available at Mercy?
3    A   There was not a peripheral vascular surgeon listed on our
4   call list.
5    Q   Okay.  And I believe that someone contacted a
6   cardiovascular surgeon that is on staff and he said you needed
7   a peripheral vascular surgeon.
8    A   I read that.  I did not contact a cardiovascular surgeon.
9    Q   Okay.  That was Dr. Bradshaw or someone else that did
10  that?
11   A   Yes, sir.  It was someone else.
12   Q   But when a -- if she needed a peripheral vascular
13  surgeon, she was going to have to go somewhere else, I take
14  it?
15   A   Oh, yes.  Absolutely.  That is why Trauma Com is
16  involved.
17   Q   Okay.  And is it the hospital policy where a patient
18  needs an emergent transfer that you must go through the Trauma
19  System, the Trauma Call Center?
20   A   I don't know if you would call that a hospital policy.  I
21  think that that is a law.
22   Q   Okay.
23   A   But, regardless, it is a system that is deployed all over
24  the country.  Every single state participates in this for the
25  benefit of Ms. Ruloph and every other patient.

1   Q   So whatever the source of it was, once it was determined
2   that she needed a transfer, that her condition needed the
3   transfer, it was mandatory that you go through the Trauma
4   System to identify the appropriate place?
5   A   Absolutely. And not only mandatory, but it is -- we rely
6   on this system.
7   Q   Okay.
8   A   Uniformly.
9   Q   Did you direct that the Trauma System be called?
10  A   I did not.
11  Q   Okay. So that was Dr. Bradshaw or someone else that
12  made -- issued that order?
13  A   Yes. But it is an understanding that if a trauma patient
14  has to be -- needs escalation beyond what our capacity is,
15  Trauma Com is contacted.
16  Q   Okay.
17  A   And they arrange for that.
18  Q   Were you in on the conversation between Mercy and Trauma
19  Com?
20  A   I was not.
21  Q   Were you -- have you been in on any of the telephone
22  conversations involving Kimberly on April 15, 2018?
23  A   I was not part of any of the trauma communication. I did
24  communicate with Washington Regional to tell them that her CTA
25  results were -- included a massive number of images, and

1    rather than sending a physical version of those images, I felt
2    that it was more valuable that she is transported and that we
3    transport the images to them separately and electronically.  I
4    didn't see any value in those images being compiled and
5    processed through the computer and traveling with her
6    physically when she could leave and those images could be sent
7    later and still be received by the surgeon prior to her
8    arrival if we sent them electronically.
9    Q    Okay.  The Washington Regional was identified, I take it,
10   by Trauma Com, as being a facility staffed to treat Kimberly's
11   situation?
12   A    Not only as a facility, but as the closest available
13   facility.
14   Q    Okay.  And so you issued an order at 1:37 for her
15   transfer, is that correct?
16   A    I issued a typed order in the medical record.
17   Q    Okay.  And does the time in the medical record of 1:37
18   sound correct?
19   A    Very similar.  I probably -- there were --
20   Q    A few minutes before that, maybe.
21   A    So until the physician at the receiving hospital has
22   accepted the patient, we cannot issue a transfer order.
23   Q    Right.
24   A    So --
25   Q    Part of the EMTALA requirements is that you can't send a

1  patient somewhere else unless they agree to accept them.
2  A    And -- precisely.  And it is not Trauma Com that accepts
3  the patient.  It is the physician at the receiving hospital.
4  Q    Right.
5  A    And after he accepted the patient with Dr. Bradshaw, I
6  then placed a trauma order just a few minutes after that.
7  Q    Okay.  But you were not a part of the conversation
8  between Washington Regional and Mercy?
9  A    I was not.
10 Q    Or Trauma Com or anyone else?
11 A    Uh-huh.
12        MR. MCNEILL:  Kristen, you're doing good.  Let David
13 finish his question before you start your answer.  You're
14 starting to jump in on him a little bit.  So let him finish.
15        MR. BLAIR:  Yeah, you know, that is a problem with
16 us folks from the south, we talk slowly and everybody
17 anticipates our question before we finish.
18        THE WITNESS:  That is the problem with women, we
19 interrupt men.
20        MR. MCNEILL:  We don't want to go there.  So -- just
21 move on.
22 Q    So in issuing the order to transfer her to Washington
23 Regional, you were relying upon the direction from Trauma Com?
24 A    Absolutely.
25 Q    And in ordering that transfer, you assumed that Trauma

1   Com was acting on accurate information?
2    A   Absolutely.
3    Q   Okay.
4    A   We have countless number of transfers through Trauma Com.
5    Q   And a part of the information that you relied upon -- the
6   assumption that you relied upon is that Washington Regional
7   was, in fact, staffed to address her problem?
8    A   Yes, sir.
9    Q   Okay.  But you never did directly confirm that from
10  Washington Regional?
11   A   I did not.
12   Q   Okay.  So at the time that you wrote the order, you were
13  relying solely upon the direction from Trauma Com, rather than
14  your own evaluation of whether that was an appropriate
15  facility?
16   A   We were following the directions of Trauma Com to
17  escalate this patient to a vascular surgeon, and we were doing
18  so expediently.  That was our goal.  That is why Trauma Com
19  serves all of these hospitals.  It is -- they can expedite the
20  process because they are not directly involved in patient
21  care.  They have the time to make phone calls, evaluate,
22  re-evaluate, determine what services are available and
23  determine what is our closest and best option for a patient.
24   Q   Right.
25   A   And they determined that our closest and best option for

1   a vascular surgeon, which was the service she needed, was
2   Washington Regional.
3   Q   And that is what you relied upon in issuing the transfer
4   order?
5   A   Absolutely.
6   Q   And, I take it, you relied upon the fact that Trauma Com
7   had accurate information that it was acting upon?
8   A   Certainly.
9   Q   Okay.
10  A   Certainly.  And --
11  Q   And part of that accurate information was the
12  availability of a peripheral vascular surgeon, correct?
13  A   Yes.
14  Q   In other words, when you issued the order, you thought
15  there was someone -- would be someone available at Washington
16  Regional capable of treating the loss of blood flow?
17  A   That is absolutely the case.
18  Q   Okay.  Didn't turn out to be the case, as we know.
19  A   As we know now.
20  Q   But you believed that --
21  A   It did not turn out to be the case.
22  Q   You believed that to be the case based upon the
23  information you had received?
24  A   The information I received is that Trauma Com had
25  determined that the best place for her to go was Washington

1   Q   Her transfer to Washington Regional was upon your order.
2   A   Correct.  I placed an order to transfer her.
3   Q   Okay.  And she couldn't have been transferred without an
4   order by you or some doctor?
5   A   So she could be transferred with just a verbal order.
6   Q   Right.  But it required an order -- verbal or written?
7   A   Correct.  Correct.
8   Q   And in giving that order that -- your order was the
9   authorization for her to be taken from Mercy to Washington
10  Regional?
11  A   My order was the documentation that she was going to be
12  transferred to Washington Regional based on Dr. Bradshaw's
13  conversation with Trauma Com and the directions they gave us.
14  Dr. Bradshaw is her specialist, and he determined that she
15  needed vascular care.
16  Q   Okay.
17  A   I certainly worked to facilitate everything that he
18  needed to complete what he was doing for the patient,
19  including documenting that order.
20  Q   Okay.  And you wrote the order pursuant the direction of
21  Trauma Com?
22  A   Yes.  And we have written thousands, probably doesn't
23  even cover the number of times that we have used the Trauma
24  Com service.  With --
25  Q   So when you use the Trauma Com service, you're relying

1  upon them to give you accurate information?
2   A   We are indeed.
3   Q   Okay.
4   A   And we have had nothing but success with that.
5   Q   And Trauma Com's ability to do so is based --
6   A   It's proven and documented through thousands of patients.
7   Q   Trauma Com's ability to give you accurate directions is
8  based upon the information it has been provided, correct?
9   A   So it is in the same sense that everything I do in the
10 Emergency Room is based on the information I have at that
11 moment.
12  Q   Sure.
13  A   Trauma Com, likewise, anyone who makes a decision is
14 basing -- well, hopefully, they're basing that decision on the
15 information they have as opposed to some other source.
16  Q   Right.  And if they have bad information, the
17 recommendation may not be correct?
18  A   I'm sorry.
19  Q   If Trauma Com has inaccurate information, the transfer
20 may not be appropriate?
21          MR. RITTER:  Object to the form.
22  A   There was -- the transfer was absolutely appropriate.
23 Dr. Bradshaw had worked with that patient and determined a
24 transfer was needed.
25  Q   A transfer was needed to someone who could address the --

1   A   A transfer was needed to a vascular surgeon, and as we
2   were directed, we sent this patient to Washington Regional for
3   vascular surgery services.
4   Q   Actually, it was a peripheral vascular surgeon that she
5   needed, was it not?
6           MR. RITTER:  Object to the form.
7   A   I would certainly object to that also.
8   Q   Well, you may object to it, but I would like an answer.
9   A   It is -- what is known to -- it is what is known as a
10  vascular surgeon.
11  Q   Okay.
12  A   If -- a cardiovascular surgeon is a cardiovascular
13  surgeon.
14  Q   Sure.  Peripheral vascular surgeon is one who specializes
15  in the extremities.  Blood flow in the extremities.
16  A   I don't know precisely.  But a peripheral vascular
17  surgeon deals with extremities of multiple regards.
18  Q   Okay.
19          MR. BLAIR:  Let's take a short break.
20          MR. MCNEILL:  Okay.
21                       **OFF THE RECORD**
22                   **DIRECT EXAMINATION CONTINUES**
23  **BY MR. BLAIR(CONTINUING:)**
24  Q   Dr. Pece, back earlier in your testimony, we were talking
25  about the time factor in terms of restoring blood flow to a

C E R T I F I C A T E

STATE OF ARKANSAS      )
                       )SS
COUNTY OF SEBASTIAN    )

      I, Kristie Knight, a Certified Court Reporter, in and for Sebastian County, Arkansas, do hereby certify that the witness, **KRISTEN PECE**, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein; that the testimony of said witness was taken by me by Stenomask and was thereafter reduced to typewritten form by me or under my direction and supervision; that the foregoing transcript is a true and accurate record of the testimony given to the best of my understanding and ability.

      I FURTHER CERTIFY that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested, or otherwise, in the outcome of this action; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

_____

Kristie Knight, CCR
Certified Court Reporter
Certificate No. 649