UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KIMBERLY RULOPH                                                          PLAINTIFF

v.                                      No. 2:20-CV-02053

LAMMICO, et al.                                                         DEFENDANTS

## OPINION AND ORDER

Before the Court are Separate Defendant Mercy Hospital-Fort Smith's ("Mercy") motion (Doc. 92) for summary judgment, brief in support (Doc. 93), and statement of facts (Doc. 94). Plaintiff filed a response (Doc. 96), brief in opposition (Doc. 97), and statement of facts (Doc. 98). Mercy filed a reply (Doc. 106). For the reasons set forth below, the motion will be granted.

## I.    Background

On April 15, 2018, Plaintiff Kimberly Ruloph arrived at Mercy's Emergency Room in Fort Smith, Arkansas with a "dislocated left knee and pulseless foot." (Doc. 94, p. 1). Dr. Jody Bradshaw was able to treat Ms. Ruloph's dislocated knee, but no pulse was present in her lower left leg. Due to the lack of pulse, Dr. Bradshaw determined Ms. Ruloph had a vascular injury that needed treatment. Because Mercy did not have a surgeon capable of treating Ms. Ruloph's vascular injury, Dr. Bradshaw determined Ms. Ruloph needed to be transferred to a different hospital.

Mercy contacted the Arkansas Trauma Communication Center ("ATCC") to find a hospital to which Ms. Rulolph could be transferred. ATCC informed Mercy that Washington Regional Medical Center ("WRMC") in Fayetteville, Arkansas could possibly treat Ms. Ruloph's injury. Dr. Bradshaw was then connected to Separate Defendant Dr. Robert Irwin at WRMC. Dr. Bradshaw explained Ms. Ruloph's injury and the lack of pulse in her left foot and stated Mercy

did not "have a vascular surgeon capable of repairing" Ms. Ruloph's injury.  (Doc. 92-4, p. 6).

Dr. Irwin testified he believed WRMC was capable of treating Ms. Ruloph's injury and understood

that Ms. Ruloph needed the services of a peripheral vascular surgeon, and Dr. Irwin accepted Ms.

Ruloph's transfer on behalf of WRMC.

Ms. Ruloph's spouse signed a transfer consent form at 2:05 p.m.  Around 2:45 p.m., Dr.

Kristin Pece, the Emergency Room physician at Mercy, called Dr. Irwin to inform him of Ms.

Ruloph's CTA results, current state, medical records, and transfer status.  At 2:55 p.m., Ms. Ruloph

left Mercy via ambulance and arrived at WRMC shortly before 4:00 p.m.  During Ms. Ruloph's

transport, at 3:12 p.m., WRMC called ATCC to report that WRMC's surgeon had reviewed Ms.

Ruloph's medical records and could not perform the type of surgery Ms. Ruloph required.  ATCC

directed WRMC to continue with the accepted transfer of Ms. Ruloph and to transfer Mr. Ruloph

to Mercy Hospital ("Mercy Springfield") in Springfield, Missouri.  Ms. Ruloph eventually arrived

at Mercy Springfield, where her leg was amputated because of the continuous lack of blood flow

to her leg.

Ms. Ruloph filed a complaint on April 8, 2020, against LAMMICO Risk Retention Group,

Inc., WRMC, Mercy, Dr. Bradshaw, Dr. Pece, Mercy Clinics Fort Smith Communities, and John

Does 1-10.  Separate Defendants WRMC, Dr. Bradshaw, Dr. Pece, Mercy Clinics Fort Smith

Communities, and John Does 1-10 were dismissed without prejudice by various orders.  On June

5, 2020, Ms. Ruloph filed her first amended complaint.  Ms. Ruloph filed a second amended

complaint on November 24, 2020, and a third amended complaint on December 29, 2020.  After

previously dismissing Defendant Mercy Clinics Fort Smith Communities ("Mercy Clinics"), Ms.

Ruloph's third amended complaint again added Mercy Clinics as a defendant.  Defendant Mercy

filed the pending motion for summary judgment arguing Ms. Ruloph's EMTALA claim against Mercy should be dismissed because Mercy complied with the EMTALA transfer requirements.

## II.     Legal Standard

On a motion for summary judgment, the burden is on the moving party to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Once the movant has met its burden, the nonmovant must present specific facts showing a genuine dispute of material fact exists for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In order for there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    Analysis

### A.     EMTALA

EMTALA applies to hospitals that have executed a provider agreement under the Medicare program.  *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996).  The purpose of EMTALA is to address the problem of patient dumping, where hospitals refuse to treat patients in an emergency room if the patients do not have health insurance.  *Id.* at 1136-37.  "A patient is 'dumped' when he or she is shunted off by one hospital to another, the second one being, for example, a so called 'charity institution.'"  *Id.* at 1136.  EMTALA requires hospitals to screen and stabilize patients who come to the emergency room and to provide the treatment required to stabilize the patient or transfer a patient if the hospital determines the patient has an emergency medical condition.  *Id.* at 1140.  "Emergency medical condition" is defined in the statute as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could

> reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A).  A plaintiff must show the hospital actually knew the patient suffered from an emergency medical condition.  *Summers*, 91 F.3d at 1140.  If a patient is not stabilized, the patient can only be transferred if

> the individual makes a written request for transfer to another hospital or a physician has signed a certification that based on the medical information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and the transfer is an appropriate transfer.

*Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F.Supp.2d 464, 510 (S.D. Tex. 2009) (internal citations and alterations omitted).  The transfer requirements under EMTALA do not have to be satisfied if the patient is stabilized.  *Id.*

If the hospital transfers the patient, the transfer must be an appropriate transfer.  An appropriate transfer is defined as a transfer

> (A) in which the hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health . . .; (B) in which the receiving facility – (i) *has available space and qualified personnel for the treatment of the individual*, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;  (C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of transfer . . .; (D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medical appropriate life support measures during the transfer; and (E) which meets such other requirements as the Secretary may find necessary in the interests of the health and safety of individuals transferred.

42 U.S.C. § 1395dd(c)(2) (emphasis added).  Thus, the elements for an EMTALA transfer claim are "(1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) the transferring

hospital did not obtain the proper consent or certification before transfer and failed to follow appropriate transfer procedures." *Guzman*, 637 F.Supp.2d at 510.

The only issue before the Court is if Mercy effected an appropriate transfer of Ms. Ruloph under EMTALA when WRMC represented it had qualified personnel and accepted the transfer, leaving Mercy to learn when Ms. Ruloph was already in transit to WRMC that WRMC did not in fact have qualified personnel to treat Ms. Ruloph.  The parties agree there are no issues of fact. Mercy argues Ms. Ruloph's transfer was an appropriate transfer because WRMC accepted the transfer, and only after Ms. Ruloph was in transit did WRMC realize it did not have qualified personnel to treat Ms. Ruloph.  Mercy argues that it believed WRMC had qualified personnel and a determination of compliance with the transfer requirements is based on a transferring hospital's actual knowledge.  Therefore, Mercy argues, Plaintiff cannot meet her burden on the inappropriate transfer claim because the undisputed facts show Mercy believed WRMC had the qualified personnel, and her EMTALA claim must be dismissed.

Plaintiff argues the undisputed facts demonstrate Plaintiff is entitled to judgment as a matter of law on her inappropriate transfer claim because Mercy breached its unconditional duty— the duty to transfer to a hospital with available space and qualified personnel—under EMTALA. Plaintiff does not dispute that Mercy subjectively believed WRMC had qualified personnel, but instead argues Mercy's actual knowledge or subjective belief is immaterial to an EMTALA claim. Plaintiff argues EMTALA does not contain any language excusing compliance because of a transferring hospital's subjective belief that another hospital had qualified personnel.

Plaintiff is correct that EMTALA does not state an appropriate transfer is based on a hospital's actual knowledge.  However, EMTALA does not state *how* a transferring hospital is to know if a receiving facility has available space and qualified personnel.  "Interpretation of a word

or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006). As discussed above, EMTALA was enacted to address the narrow issue of patient dumping. The legislative history also reveals that another purpose behind EMTALA was to address the issue of unstable patients being transferred to a receiving hospital without a receiving hospital's consent. *Summers*, 91 F.3d at 1136-37 (explaining EMTALA purpose and legislative history). When examining the EMTALA statute as a whole and case law interpreting the statute, the Court finds the requirement that an appropriate transfer is one in which the receiving facility has "available space and qualified personnel for the treatment of the individual" is based on the transferring hospital's actual knowledge. To read the statute any other way would require a transferring hospital to have a level of omniscience that is impossible.

The Court is not alone in finding EMTALA transfer violations must be predicated on a hospital's actual knowledge. *See Summers*, 91 F.3d at 1140 (finding a hospital must have actual knowledge of the individual's unstabilized emergency medical condition); *cf. Guzman*, 637 F. Supp. 2d at 478-480 (explaining hospital must transfer only if hospital has actual knowledge of emergency medical condition, EMTALA does not establish a federal malpractice cause of action nor nationalized standard of medical care, and finding that the unavailability of a bed at a receiving hospital did not amount to EMTALA transfer violation); *see also Vickers v. Nash. Gen. Hosp.*, 78 F.3d 139 (deciding hospital must have actual knowledge of emergency medical condition and take steps to stabilize that condition, and "[a]nalysis by hindsight, however, is not sufficient to impose liability under EMTALA").

Here, the undisputed facts are that Mercy contacted ATCC to determine if there was a hospital with personnel that could accept transfer of Ms. Ruloph, Mercy was then put in contact

6

with WRMC, and WRMC agreed to accept Ms. Ruloph because Dr. Irwin believed WRMC had qualified personnel.  Mercy transferred Ms. Ruloph after coordinating with the receiving hospital to ensure Ms. Ruloph could be treated there.  Only after Ms. Ruloph was transferred and en route via ambulance to WRMC did WRMC realize it did not have the qualified personnel.  Mercy could not have known WRMC's representation that it had qualified personnel was false or mistaken. Mercy had the right to rely upon the representation made by the receiving hospital when it made the decision to transfer.  Because Mercy's actual knowledge at the time of Ms. Ruloph's transfer was that WRMC had available space and qualified personnel, and WRMC accepted the transfer, the Court finds Mercy effected an appropriate transfer.  Plaintiff's inappropriate transfer claim under EMTALA must be dismissed.

### B.    State Law Claims

Because this Court is dismissing the claim over which it is has original jurisdiction, the claims over which the Court has supplemental jurisdiction will be dismissed without prejudice.  28 U.S.C. § 1367(c)(3); *Keating v. Neb. Pub. Power Dist.*, 660 F.3d 1014, 1018-19 (8th Cir. 2011).

### IV.    Conclusion

IT IS THEREFORE ORDERED that Defendant Mercy's motion (Doc. 92) is GRANTED. Plaintiff's EMTALA claim against Mercy is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE.  Judgment will be entered accordingly.

IT IS SO ORDERED THIS 11th day of February, 2021.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE